868 So.2d 844 (2004)
Susan Folse McCLANAHAN
v.
Jack McCLANAHAN.
No. 03-CA-1178.
Court of Appeal of Louisiana, Fifth Circuit.
February 23, 2004.
Order Granting Rehearing in Part April 14, 2004.
*846 Marc D. Winsberg, Schonekas, Winsberg, Evans & McGoey, LLC, New Orleans, LA, for Appellant.
Robert C. Lowe, David M. Prados, Lowe, Stein, Hoffman, Allweiss & Hauver, L.L.P., New Orleans, LA, for Appellee.
*847 Panel composed of Judges EDWARD A. DUFRESNE, JR., SOL GOTHARD and JAMES L. CANNELLA.
JAMES L. CANNELLA, Judge.
The Plaintiff, Susan Folse McClanahan (Ms. McClanahan) and the Defendant, Jack McClanahan (Mr. McClanahan), both appeal from the judgment rendered in this community property partition action. For the reasons which follow, we affirm in part, reverse in part, amend in part and render.
The parties were married on January 23, 1988 and their community terminated on March 25, 1998.[1] It is not disputed that prior to the marriage, Mr. McClanahan had a net worth of between 40 and 60 million dollars and at the termination of the marriage he had a net worth of approximately 10 million dollars. Mr. McClanahan attributed this significant downturn primarily to the crash in the oil industry. During the course of this ten year marriage Mr. McClanahan engaged in numerous complicated business transactions, as was his customary practice. Many of these transactions were through his primary company which, both parties agree, he owned prior to the marriage, McClanahan Contractors.
Mr. McClanahan testified that McClanahan Contractors was originally formed in 1964 when he was 21 years old. At that time, it was named American Workover, Incorporated (AWI). He testified that AWI had quite a number of subsidiaries over the years that it "bought, sold, merged and spun off," naming a few, Ducaine Natural Gas, McFarland Pump, Joe Bolt, Cushing, and Cherokoe Equipment. Mr. McClanahan owned 85% of McClanahan Contractors and Richard White owned the other 15%. The other major company through which Mr. McClanahan conducted business was Aransas Drilling and Workover (Aransas). In 1981 out of bankruptcy, McClanahan Contractors acquired Aransas, formerly called Matagorda Drilling. Aransas was a wholly owned subsidiary of McClanahan Contractors with the exception of between 1% and 3%, which was owned by each of Mr. McClanahan's children.
Over the years, Mr. McClanahan conducted business through several other companies, partnerships and corporations, some of which existed prior to the marriage and some of which came into existence during the marriage. Ms. McClanahan's general view is that she is entitled to part of the assets resulting from all of these business transactions. The issues raised in these appeals involve property acquisitions, transactions and reimbursement claims that occurred during the marriage and are best considered individually.
First, an overview of the legal principles involved is helpful. Community property is made up of property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse, property acquired with community things or with community and separate things, unless classified as separate property under Article 2341. La. C.C. art. 2338. The natural and civil fruits of the separate property of a spouse are community property. La. C.C. art. 2339. Things in the possession of a spouse during the existence of a regime of community of acquets and gains are presumed to be community, but either spouse may prove that they are separate property. La. C.C. art. 2340. The separate property of a spouse is his exclusively. Separate property is made up *848 of property acquired by a spouse prior to the establishment of a community property regime and property acquired by a spouse with separate things or with separate and community things when the value of the community things is inconsequential in comparison with the value of the separate things used. La. C.C. art. 2341. A spouse's undivided interest in property, otherwise classified as separate property under Article 2341, remains his separate property regardless of the acquisition of other undivided interests in the property during the existence of the legal regime, the source of improvements thereto, or by whom the property was managed, used, or enjoyed. La. C.C. art. 2341.1. If community property has been used for the acquisition, use, improvement, or benefit of the separate property of a spouse, the other spouse is entitled, upon termination of the community, to one-half of the amount or value that the community property had at the time it was used. La. C.C. art. 2366. By the same token, if separate property of a spouse has been used for the acquisition, use, improvement, or benefit of community property, that spouse, upon termination of the community, is entitled to one-half of the amount or value that the property had at the time it was used. La. C.C. art. 2367. If the separate property of a spouse has increased in value as a result of the uncompensated labor or industry of either spouse, the other spouse is entitled to be reimbursed from the spouse whose property has increased in value one-half of the increase attributed to the common labor. La. C.C. art. 2368. A spouse is liable for any loss or damage caused by fraud or bad faith in the management of the community property. La. C.C. art. 2354.
In interpreting La. C.C. art. 2354, the jurisprudence has recognized, since the 1980 community property revision, that no fiduciary duty exists with respect to management of community property. Jamison v. Jamison, 528 So.2d 1094 (La.App. 3rd Cir.1988); Rivers v. Rivers, 381 So.2d 573 (La.App. 2nd Cir.1980), writ denied, 383 So.2d 799 (La.1980); K. Spaht, Developments in the Law1986-87, 48 La. L.Rev. 371, 373 (1987). It seems that acting out of self interest is not enough to constitute fraud or bad faith under Article 2354. Rather, a subjective element, the intent to injure or the intent to reduce a spouse's community interest, must be established. Katz v. Katz, 423 So.2d 1277 (La.App. 4th Cir.1982), writ denied, 427 So.2d 860 (La.1983); Katherine S. Spaht & W. Lee Hargrave, Louisiana Civil Law Treatise, Matrimonial Regimes, Vol. 16, § 5.22, (2d ed.1997). In other words, more than financial injury must be shown. "A malevolent mental state related to decreasing the amount of money the spouse is to receive in a partition of community property is necessary." Katherine S. Spaht & W. Lee Hargrave, Louisiana Civil Law Treatise, Matrimonial Regimes, Vol. 16, § 5.22, at 290 (2d ed.1997).
Because property acquired by the effort, skill or industry of a spouse is community, to the extent that a spouse's labor is producing some benefit, the community ought to share in the profit of that labor. Thus, in the case where a spouse's labor increases the value of a separate asset, the equitable solution is reimbursement for that effort by awarding the nonowner spouse one-half of the increase attributable to the common labor. La. C.C. art. 2368. If the labor is combined with separate capital or other separate property, equity would suggest a proportional division of the profits between the community and separate estates of the spouses. Katherine S. Spaht & W. Lee Hargrave, Louisiana Civil Law Treatise, Matrimonial Regimes, Vol. 16, § 3.8 & 3.49 (2d ed.1997). Assets owned by a corporate *849 entity are the property of that entity and are not owned by the shareholders or partners. Such acquisitions by the entity are not community property of the spouses even if the latter are owners of stock or are partners. Taylor v. Taylor, 33,959 (La.App. 2nd Cir. 11/1/00), 772 So.2d 891. If a spouse is the principle involved in a company and he or she expended labor on company operations during the marriage for which he was not compensated, the other spouse's remedy is a claim for uncompensated common labor under La. C.C. art. 2368. Taylor v. Taylor, supra; Katherine S. Spaht & W. Lee Hargrave, Louisiana Civil Law Treatise, Matrimonial Regimes, Vol. 16, § 3.11 (2d ed.1997). We apply these legal precepts to the property and reimbursement disputes raised in this case.

MR. McCLANAHAN'S APPEAL

Sterling Investments, LLC (Sterling Investments)
The trial court determined that Sterling Investments was a community asset and valued it at $221,142. Mr. McClanahan argues on appeal that the trial court erred in this conclusion.
Sterling Investments was formed in 1995 during the marriage. However the owners of the company were McClanahan Contractors (50%) and Kelly O'Rourke (O'Rourke), Mr. McClanahan's daughter from a prior marriage, (50%). Initially, McClanahan Contractors paid $50,000 in capital, funds Mr. McClanahan testified came from the sale of other separate property owned by the corporation. Sterling Investments also obtained a loan from Whitney National Bank in the amount of $169,200 which was personally guaranteed by both Mr. McClanahan and O'Rourke. On May 15, 1996 Sterling Investments purchased for $211,000 a piece of residential property in which O'Rourke intended to reside. In September of 1997, O'Rourke assigned an oil and gas lease to Sterling Investments that was valued as a $25,000 capital contribution. At some point Aransas made a loan to Sterling Investments in the amount of $184,871. There was also a second loan obtained from Whitney National Bank in the amount of $370,000 which was guaranteed personally by Mr. McClanahan. McClanahan Contractors made an additional $4000 capital contribution to the company on July 15, 1999. Another residential property was purchased for $465,000 by the company after the marriage terminated on July 15, 1999. O'Rourke made some draws from the company in the amount of $29,700. Mr. McClanahan testified that O'Rourke made repairs and improvements to the first property valued at $93,000. Mr. McClanahan testified that the purpose of the company was to assist his daughter in acquiring a house. By doing it through the company the house would not be titled in her name if she did not pay for it.
Mr. Asher, Ms. McClanahan's accountant, testified that the company created during the marriage should be treated as community property and placed a value on the asset of $271,142. He arrived at the figure by adding the appraised value of the first property, $310,000, to the value of the second property, $467, 948, less $3,300 for a tax adjustment. Then, he subtracted the two loans due the Whitney National Bank to reach the value of the asset. Mr. Asher did not subtract the capital contributions or the loan from Aransas in arriving at this figure. Ms. McClanahan argues that the trial court erred in valuing this community asset at $221,142 and argues that it should be valued at $271,142.
In concluding that the asset was community property and valuing it at $221,142, we find that the trial court committed *850 legal error in several respects. First, the asset cannot be community property since it in no way belonged to Mr. McClanahan. Sterling Investments was owned 50% by a separate and distinct corporate entity, McClanahan Contractors, and 50% by O'Rourke. Ms. McClanahan has not argued, nor would it be supported by the record, grounds to pierce the corporate veil and we find no reason to do so. Further, no intent on the part of Mr. McClanahan to reduce the community interest has been shown. Mr. McClanahan testified that he was trying to assist his daughter's acquisition of a $211,000 house, a thing that a father with a 50 million dollar separate estate has the right to do. Thus, respecting the legal status of McClanahan Contractors as a separate and distinct legal entity, and the fact that it is not disputed that McClanahan Contractors is the separate property of Mr. McClanahan, the asset cannot be community property. However, to the extent that Mr. McClanahan's separate property has been enhanced by his labor, or that his labor has been uncompensated, during the community, Ms. McClanahan is due reimbursement of one-half the increase in the value of Mr. McClanahan's separate property that is attributable to his labor during the community.
In determining the proper value for the community labor, we note that the second property was purchased after the termination of the community. Thus any labor that went into that endeavor would not create a community debt. There was an increase in value of the property purchased during the community from $211,000 to $310,000 or $99,000. One-half of this ($44,500) belongs to O'Rourke since she is a 50% owner. The other one-half ($44,500) belongs to McClanahan Contractors of which Mr. McClanahan owns 85%. So, Mr. McClanahan's separate property, McClanahan Contractors, was increased in value by $37,825. To the extent that Mr. McClanahan's labor, working for McClanahan Contractors, contributed to increasing the value of his separate property, the community is due reimbursement. The increase in value must be prorated, however, between the corporate capital used and the community labor, which we find contributed equally to the profit. Thus, we find that the community is due reimbursement of one-half the value of the increase of Mr. McClanahan's 85% interest in McClanahan Contractors, or $18,912.50.

Bank One IRA Account # EH8-779563
The parties stipulated that the Bank One IRA has a value of $234,621. The trial court found that it was a community asset, valued it without explanation at $152,683, and awarded it to Mr. McClanahan. Mr. McClanahan argues that the court erred in finding that the IRA was a community asset. All contributions were made to the IRA by Mr. McClanahan prior to the marriage and none were made during the marriage. Thus, under the T.L. James Co., Inc. v. Montgomery, 332 So.2d 834 (La.1975) formula for dividing retirement accounts, none of the account should be considered a community asset.
It is not disputed that all of the contributions to the IRA account were made by Mr. McClanahan prior to the marriage and none were made during the marriage. Also, no withdrawals were made during the marriage. The asset was acquired prior to the marriage. Thus, the asset is clearly the separate property of Mr. McClanahan. La. C.C. art. 2341. The fact that community property in the nature of fruits was added to the account, does not change the character of the asset from separate property to community. La. C.C. art. 2341.1. However, the fruits of separate property of one spouse are community property. La. C.C. art. 2339. Therefore, *851 we find that the IRA account is the separate property of Mr. McClanahan, but he owes an accounting and debt to the community for the increase in value attributable to the natural and civil fruits that accrued during the marriage.
The record indicates that the IRA account had a value at the time of the marriage of $81,938. Mr. McClanahan did not produce sufficient evidence to establish what part of the remainder of the value of the account is attributable to natural and civil fruits and, thus, community or capital appreciation and, thus, separate. To the extent that Mr. McClanahan has not established what part of those funds are separate property, being earned during the community, they will be presumed community. La. C.C. art. 2340. Accordingly, although the Bank One IRA is the separate property of Mr. McClanahan, he owes a debt to the community of $152,683, the difference between the stipulated value of the IRA, $234,620, and the sum conclusively proven to be Mr. McClanahan's separate property, $81,958.

Wood River Resorts, Inc., L.L.C. (Wood River Resorts)
The trial court awarded Ms. McClanahan $158,250 on this reimbursement claim for profit allegedly acquired by Wood River Resorts. Mr. McClanahan argues that the acquisition was not community property.
It is undisputed that Mr. McClanahan owned one quarter of the Wood River property prior to his marriage. In approximately 1992, an additional 25% interest was acquired. Mr. McClanahan testified that it was acquired by a subsidiary of McClanahan Contractors called Delta Pipe and Supply (Delta). Delta was formed in 1986 and is owned by Mr. McClanahan and his three children, who each own a 7½% interest.[2] Ms. McClanahan presented evidence through a personal financial statement indicating that the additional 25% was acquired by Mr. McClanahan personally. The acquisition of this second 25% was facilitated by a loan from Aransas. Mr. McClanahan then contributed his separate 25% interest to Delta and Delta contributed the 50% interest in the Wood River property to Aransas for the debt.
Thereafter, Aransas and Mr. McClanahan's son, Chris, formed Wood River Resorts, Inc., L.L.C., which secured a loan from the Whitney National Bank to purchase the remaining 50% of the Wood River property. Aransas eventually acquired Chris' share of the Wood River property in exchange for taking over his part of the debt to Whitney National Bank, resulting ultimately in Aransas' 100% ownership of the Wood River property.
Like Sterling Investments, we find that the Wood River property was not acquired personally by Mr. McClanahan, but was acquired through separate legal entities. We find no reason to look behind the corporate structure. Thus, the Wood River property did not constitute community property. However, since it was Mr. McClanahan's labor that facilitated an increase in his separate property through corporate equity, the community is due reimbursement for the increase attributable to his labor.
The property appraised at the time of trial for $1,400,000. 25% of that belonged to Mr. McClanahan prior to the marriage. Thus, the value in dispute is ¾ of the total or $1,050,000. The acquisition cost of the property consisted of a $212,500 loan from *852 Aransas for acquisition of the 25% share and a $500,000 loan from Whitney National Bank for acquisition of the 50% share. Thus, the value of any increase in value of Mr. McClanahan's separate property is $1,050,000 minus the acquisition costs of $712,500, or $337,5000. 22 ½% of that belongs to the three children as part owners of Aransas, leaving $261,562. To determine the amount of the increase in value of Mr. McClanahan's separate property attributable to his labor, the total increase, $261,562 must be prorated between the value of corporate capital used and the community labor. Since the majority of the acquisition costs were from a bank loan, we find that the increase in value of Mr. McClanahan's separate property is 75% attributable to his community labor. Thus, we find that the community is due reimbursement of $196,171.50, attributable to the community labor that was expended to increase the value of Mr. McClanahan's separate property by the Wood River property acquisition, or $98,085.75, to Ms. McClanahan.

Four-Ten Land and Production Inc. (Four-Ten)
The trial court awarded Ms. McClanahan $142,030 on this reimbursement claim based on the capital account of this company at the time it was terminated. Mr. McClanahan argues that any capital attributable to this company was his separate property.
It is undisputed that this entity was incorporated in 1985, prior to the marriage. The corporation was originally owned by AWI. As testified to by Mr. McClanahan, its only asset was some real estate, owned by AWI since 1979, located at 1504 Engineer Road in Belle Chase, Louisiana. The corporation was "spun out of" McClanahan Contractors for some time, but eventually merged into Aransas in July of 1997. During a four day period between July 27, 1988 and July 31, 1988 there is documentation showing that the corporation had no assets and no liabilities. Thereafter, a July 31,1988 document shows the corporation with assets of $1,578,000. When the corporation was merged into Aransas in 1997, there was "paid in capital" in the amount of $284,000. It is one half of this amount that the trial judge ruled Mr. McClanahan should reimburse to Ms. McClanahan.
Mr. McClanahan argues that the trial court erred because Four-Ten came into existence before the marriage, it was a subsidiary of his separately owned company and its only asset ever was the property located on Engineers Road that had been owned by AWI since 1979. In other words, Mr. McClanahan argues that any interest he had in the company was his separate property and the only asset owned by the company was separate property.
Ms. McClanahan disputes this by showing that for four days during the marriage the company owned nothing and then it acquired something thereafter, during the community, so that should be a community interest. She values her interest in this property by the amount of the paid in capital when Four-Ten merged with Aransas. Ms. McClanahan's claim here seems to be for an advantage that could have been placed with the community rather than with this separately held corporation.
We find no legal support for Ms. McClanahan's claim. The tax return of the company shows a four day period where Four-Ten had no assets. The other documentation as well as the testimony establishes that any interest Mr. McClanahan had in Four-Ten was his separate property. The only asset of Four-Ten was 1504 Engineer Road the former property of AWI, a company that was also Mr. McClanahan's separate property. This *853 was the only asset of Four-Ten when it terminated in a merger with Aransas, which was also separately owned by Mr. McClanahan. Even assuming that there were four days where the company divested itself of ownership of the separate property and thereafter reacquired it, that would not give rise to a community claim where there is no evidence of any intent by Mr. McClanahan to reduce his spouse's community interest or injure her in any way. The property, as well as all the companies involved, were Mr. McClanahan's separate property. Accordingly, we find that the trial court erred in awarding Ms. McClanahan reimbursement for onehalf of the paid in capital in Four-Ten at the time of its dissolution.

Management Fees Paid to Delta
The trial court awarded Ms. McClanahan $75,000 in reimbursement on this claim. As stated above, Delta was a company that was formed prior to the marriage. It was owned by Mr. McClanahan and his three children who each owned 7½ % of the company (22.5% total). At issue here is a fee of $150,000 paid to Delta by McClanahan Contractors in 1997. The trial judge ordered that Mr. McClanahan reimburse Ms. McClanahan one-half of that sum, or $75,000.
On appeal Mr. McClanahan argues that the trial court erred in ordering him to pay Ms. McClanahan reimbursement for onehalf of this fee. He argues that it was payment for services from one separate corporation to another and should not inure to the benefit of the community.
Ms. McClanahan argues to the contrary that the payment was in reality salary to Mr. McClanahan that should have gone to the community. She points out that Mr. McClanahan was the primary owner of Delta and the controlling principal in McClanahan Contractors. Mr. McClanahan testified that there were years when he worked for McClanahan Contractors and did not get paid. He also admitted that Delta had no payroll employees, only some people who worked for the company under outside contractors. Nevertheless, Mr. McClanahan testified that Delta was created to buy rig supplies at a discount and resell them and to rent some tools that it owned. Mr. McClanahan admitted that he "caused" the $150,000 fee payment to Delta.
Ms. McClanahan argues that no work was done for this fee. It was nothing more than a transfer of funds from one company to another. However, we fail to see how this argument benefits Ms. McClanahan since, presumably, McClanahan Contractors, which was the separate property of Mr. McClanahan, would be able to donate funds from it to another separately held company without any benefit to Ms. McClanahan. Since, Mr. McClanahan testified that work was performed for the services and that was not factually contradicted, we will address the issue as a claim for uncompensated labor during the marriage that enhanced Mr. McClanahan's separate property.
Like some of the other issues that we have considered, this was a payment by one corporate entity to another. Absent a determination to pierce the corporate veil, which has not been made herein, the payment itself would not constitute community property. However, the community is entitled to reimbursement for the value of community labor used to enhance separate property. La. C.C. art. 2368. We look to the value of the enhancement. Delta was paid $150,000 that was generated in part by Mr. McClanahan's work effort or labor. Delta was owned in part (22.5%) by Mr. McClanahan's children. To the extent that they are owners of the company, 22.5% of any fees paid to the company *854 belong to them and are not an increase in the value of Mr. McClanahan's separate property. Thus, we find that we must deduct 22.5% of the fee from any increase in the value of Mr. McClanahan separate estate. Therefore, we find that Mr. McClanahan's separate estate was enhanced by Mr. McClanahan's community labor in the amount of $116,250, to which Ms. McClanahan is entitled to reimbursement of one-half, or $58,125. Thus the trial court award for reimbursement of these management fees is reduced from $75,000 to $58,125.

Other Management Fees
The trial court awarded Ms. McClanahan $50,000 in reimbursement on this claim. On the McClanahan Contractor's 1997 tax return, there is an entry for management fees paid, some of which were discussed above. This includes an additional $100,000 of management fees paid by the company in that year. The entry does not specify who the payees were for those fees. The trial judge ruled that onehalf of the $100,000 had to be reimbursed by Mr. McClanahan to Ms. McClanahan. Having no reasons for judgment, we have no idea what legal theory this determination was based upon, except as gleaned from the argument of the parties.
Mr. McClanahan argues that this was an operating company and that the management fees were legitimate expenses of doing business and should not be reimbursable to the community. Ms. McClanahan argues that the management fees paid by McClanahan Contractors are nothing more than a diversion of what should have been community income.
Again, we note that McClanahan Contractors was an ongoing business that had income and expenses of operation. On this same tax return, with the fiscal year ending on July 31, 1997, there is an entry showing negative taxable income for the company in the amount of $852,000. While Ms. McClanahan's expert cautions that this should not be viewed as the economic status of the company, it does evidence the fact that the separately owned corporation was not making enormous profits at the expense of the community. As a legitimate ongoing concern, we can find no legal theory under which to conclude that an entry on a corporate tax return for management expenses creates a debt to the community of the major shareholder, especially considering that this company was the separate property of Mr. McClanahan. If there were something improper about the payment of the fee, as implied by Ms. McClanahan, then a derivative action might be in order, but not a finding that the community is owed the money. We set aside the trial court award of $50,000 due as reimbursement to Ms. McClanahan for these funds.

Community funds diverted to Delta
The trial court awarded Ms. McClanahan $296,116.50 in reimbursement on her claim that community funds were improperly diverted to Delta. Delta was a company that was formed prior to the marriage and was owned by Mr. McClanahan and his three children, the children owning 7½% each and Mr. McClanahan owning the remainder. Mr. McClanahan argues that this award was completely erroneous based on the evidence. All that was established at trial, through Delta's tax documents (K-1s), was that Delta had capital contributions during the time of the marriage in the amount of approximately $1.6 million dollars. There was no showing where most of this money came from.[3] *855 Mr. McClanahan testified that none of the capital contributions came from community property and, therefore, no community reimbursement is due for the capital balance found in a company. Moreover, Mr. McClanahan argues that even if the money was considered community, he made over 1.6 million dollars of withdrawal from Delta for the benefit of the community, which would offset any debt owed to the community.
Ms. McClanahan argues that because the funds appeared in the capital account during the marriage, it was incumbent upon Mr. McClanahan to prove that the funds came from separate property or they should be presumed to be community.
As was the consensus of both parties, this Court cannot determine how the trial court arrived at the $296,116.50 figure awarded for this claim. Nor can we find a debt owed to Ms. McClanahan based on capital contributions of a separate legal entity, Delta, during the time of the marriage. The only evidence presented to support the reimbursement claim is the tax documents of the business showing its capital account, without any evidence of from where the money came. The capital account of a business simply does not equate, without more, with a community debt. This was not money acquired by a spouse during the marriage. It was acquired by a separate legal entity which was additionally the separate property of Mr. McClanahan. Further, the general financial status of all the parties throughout the marriage appears to have been that the marriage commenced with Mr. McClanahan having a rather large separate estate and the community never amassing any substantial liquid assets. At the end of the marriage, the community still did not have a great deal of liquid assets and Mr. McClanahan's separate estate had been reduced from 50 to 10 million dollars. Thus, we find that the record does not support a finding that the community contributed 1.6 million dollars to Delta's capital account. This reimbursement award to Ms. McClanahan is vacated.

MS. McCLANAHAN'S APPEAL

Prudential Securities Individual Retirement Account (Prudential Securities IRA)
The trial court valued the Prudential Securities IRA, which the parties stipulated was community property, at $34,154 and awarded it to Mr. McClanahan. Ms. McClanahan argues that since she is owed a large equalization payment, she should have been awarded this account.
The trial court is granted much discretion in allocating assets. La. R.S. 9:2801. Ms. McClanahan has shown no abuse of that discretion in the trial court's award of this asset to Mr. McClanahan. Further, in view of our findings above, the equalization payment due has been substantially reduced or is non-existent. Thus, we find no error in the trial court award of the Prudential Securities IRA to Mr. McClanahan.

Barrios Services, Inc. (Barrios) 401(k) Plan
The trial court valued the Barrios 401(k) Plan, which the parties stipulated was community property, at $3,978 and awarded it to Mr. McClanahan. Ms. McClanahan argues that since she is owed a large equalization payment, she should have been awarded this account. For the same reasons given concerning the Prudential Securities IRA, we find no error in the *856 trial court allocation of this asset to Mr. McClanahan.

Massachusetts Mutual (Mass Mutual) Life Insurance Policy
The trial court valued the Mass Mutual life insurance policy, which the parties stipulated was community property, at $81,430 and awarded it, upon motion for new trial, to Mr. McClanahan. Ms. McClanahan argues that since she is owed a large equalization payment, she should have been awarded this account. For the same reasons given concerning the Prudential Securities IRA, we find no error in the trial court allocation of this asset to Mr. McClanahan.

Investment Account at First National Bank of Commerce (FNBC)
The parties had an investment account at FNBC which Ms. McClanahan argues should have been deemed community property and valued at $9,000. She arrives at the $9,000 value from an entry on a Financial Statement prepared by Mr. McClanahan, dated February 28, 1998.
Mr. McClanahan does not dispute that this is a community account but does dispute the value placed on it by Ms. McClanahan. He argues that it should be valued at no more than $2,525.35, which is the balance listed on the FNBC statement covering February 20, 1998 to March 24, 1998. The community was effectively terminated on March 25, 1998.
We find that the account was a community account and that the value at the time of the dissolution of the marriage was $2,525.35, as provided on the statement ending one day before the marriage was terminated. Since this asset has remained in Mr. McClanahan's possession, Ms. McClanahan is due $1,262.68 from Mr. McClanahan.

Sterling Financial Services
The trial court did not award anything on this claimed community asset. Ms. McClanahan argues that the trial court erred in not finding that Sterling Financial Services was a community asset and in not valuing it at $14,852. Ms. McClanahan arrives at the value based on a balance sheet for the company dated December 31, 1997 showing an asset, Nolan 1, worth $12,500 and two checks totaling $2,352.
Mr. McClanahan contends that this company was not community property and was properly excluded by the trial court. Further, any assets in the company before it was liquidated in October of 1997 were withdrawn and spent on the community or on Ms. McClanahan. Mr. McClanahan testified that although the balance sheet showed an asset worth $12,000, in fact that asset had been sold in October and the company was simply awaiting final payment. Thereafter, $9,000 of the funds were withdrawn for community expenses and the remaining $2,352 was withdrawn and gratuitously placed in Ms. McClanahan's IRA after the divorce.
With no reasons from the trial court we cannot determine with certainty why the trial court omitted this asset from the community. The company was started during the community and Mr. McClanahan owned 100% of the company. That would constitute a community asset. However, the company has since been liquidated and the record does support the finding that there were no assets in the company at the time of the divorce that had not been withdrawn for the benefit of the community or Ms. McClanahan. Thus, we find no error in the omission of this asset from the community accounting.

Capital Contributions to Wood River Resorts
The trial court did not award reimbursement on this claim. Ms. McClanahan argues *857 that capital contributions made by Aransas to Wood River Resorts in the years 1996, $117,000, and 1997, $316,250, should be reimbursed to the community.
Ms. McClanahan's claim of ownership or reimbursement regarding Wood River Resorts has been thoroughly considered above. Ms. McClanahan argues here that the money paid by Aransas to Wood River Resorts should be considered community funds to which she should be entitled to one half in reimbursement.
Mr. McClanahan argues that the trial court was absolutely correct in rejecting this claim for reimbursement. Aransas, a separately held corporation advanced money to Wood River Resorts. Ms. McClanahan concedes that Mr. McClanahan did not advance the money personally.
The advancement of funds by one corporate entity to another, without more, does not involve the community of a partner or shareholder nor create a valid reimbursement claim in favor of the community. Ms. McClanahan is entitled to, as we held above, a reimbursement claim for the community labor utilized to make the deal, but she has made no showing here that the advanced funds were a product of her husband's community labor. Aransas became the eventual owner of the Wood River property in return for the funds advanced. We find no error in the trial court decision to reject this reimbursement claim.

Capital Contributions to Junction Beefmaster
The trial court did not award reimbursement on this claim. Ms. McClanahan argues that the trial court erred in not awarding her reimbursement for her share of $689,114 that was evidenced as capital contributions to Junction Beefmaster. She admits that the Junction Beefmaster partnership was formed before the marriage, but contends that $689,114 in capital contributions were made to the company during the marriage. Those funds should be considered community property since it cannot be established from where they came.
Mr. McClanahan argues to the contrary that the trial court properly rejected the claim for reimbursement. In fact, the Warranty Deed evidences that Delta bought the property or entered into the partnership, Junction Beefmaster, and not Mr. McClanahan personally. Further, other documents, including checks from Delta to Junction Beefmaster, indicate, at least in part, that the capital contributions came from Delta and not from Mr. McClanahan personally.
As discussed above on the Wood River Resorts claim, simply having capital contributions show up in a partnership accounting does not automatically create a valid reimbursement claim in that same amount in favor of the community of a partial owner. And, in this case, Mr. McClanahan was not even the owner. Delta, another separately owned company, was the owner. Accordingly, we find no error in the rejection of this claim by the trial court.
Contributions to McClanahan, White and McClanahan
The trial court did not make an award on this reimbursement claim by Ms. McClanahan. This company was formed in 1954 by Mr. McClanahan's parents. Mr. McClanahan owned 53% of the company with two other owners each owning between 20 and 25% of the company. Ms. McClanahan argues that the trial court erred because the records of the company show an increase in capital contributions of $79,921, despite the fact that the company was not making money. Therefore, as with the Junction Beefmaster claim, Ms. McClanahan argues that any increase in capital in the company should be considered community property.
*858 Mr. McClanahan points out that he testified, and it was not contradicted, that no community money or property was given to this company. Therefore, he argues that the burden was on Ms. McClanahan to show where the capital contributions came from and, absent some proof that it came from community property, Mr. McClanahan owes no reimbursement for money that appears in the capital account of a company of which he owns 53%.
For the same reasons provided for our determination on the Junction Beefmaster reimbursement claim, we find no merit in this claim for reimbursement. Money in a corporate capital account that appears during the course of a marriage does not, without more, equate to a community reimbursement claim. We find no error in the trial court's rejection of this claim.

Contributions to McClanahan Barges
Ms. McClanahan presents the same argument here as for the previous three companies, that money in the capital account of the company, $26,250, should result in a reimbursement claim to the community, despite the fact that it is a separately held corporation and there is no evidence as to where the capital funds came from.
McClanahan Barges was formed in 1980, before the marriage and Mr. McClanahan owned 70% of the company. The trial court rejected the claim. For the reasons stated above, we find no error in the trial court rejection of this reimbursement claim.

Diversion of Community Opportunity to Mr. McClanahan's Children through Delta
The trial court made no award for this claim. Ms. McClanahan is arguing here that the community is owed $82,181, which represents the percentage of income earned by Delta that benefited Mr. McClanahan's children (including the child of this marriage) because they were partners in the company.
As previously stated, Delta was formed in 1986, two years before the marriage, and Mr. McClanahan's two children were made partners in the company when it was formed. When Mr. McClanahan's third child was born, she too was given a share equal to her siblings in the company. There is absolutely no evidence cited or found that shows that making his children partners in this company was done for the purpose of diverting funds from the community. In fact, what we glean from the record as a whole is that Mr. McClanahan has been doing business this way, through various corporations and partnerships, all of his life. In fact, he inherited some of the businesses from his parents, who also operated through various corporations, as will his children, since even the two year old held partnership interests. Absent a showing of intent to defraud the community or to divert funds from the community, the community has no claim for diverting of community opportunities under these circumstances. As Mr. McClanahan pointed out, his fiduciary duty was to his partners in the business and not to the community. We find no error in the trial court rejection of this claim.

Diversion of Community Opportunity to Barrios and Stock Value
Ms. McClanahan argues that the trial court erred in rejecting these reimbursement claims because they amounted to nothing more than a way for Mr. McClanahan to receive a profit from a venture without it inuring to the benefit of the community.
In 1994, during the marriage, Mr. McClanahan's son, Chris, acquired an interest in Barrios that may have proven to *859 be profitable. At the time, Mr. McClanahan had accepted a position as Secretary of the Department of Natural Resources under then Governor Edwards and he could not be a part of such a business. Chris received funding for the acquisition through loans from Delta and McClanahan Contractors. In 1998, Chris sold Barrios to R & B Falcon and R & B Falcon stock was issued to Chris. Aransas thereafter came into possession of 39,554 shares of R & B Falcon stock as repayment for equipment taken from Aransas and for lease cancellation. In 1999, Aransas sold the stock for $429,781, the amount of Ms. McClanahan's reimbursement claim herein. Alternatively, Ms. McClanahan argues that since Chris was issued 124,989 shares of R & B Falcon stock at the time of the sale, and that stock was valued, at the time of trial, at $17 per share or $2,125,000, this amount should be reimbursed to the community for the diverting of a community opportunity.
Mr. McClanahan testified that he had little or nothing to do with the Barrios deal. He stated that because of his health and age, he was cutting back. He had accepted a position with the state that prevented him from entering into any deal to purchase Barrios. He could not have acquired the business for the community, even if he had wanted to. He testified that it was his son's deal and not his. Mr. McClanahan also points out that the Aransas stock acquisition was for the legitimate repayment for equipment and a lease and had nothing to do with the community.
Based on the foregoing, we find no error in the trial court rejection of this reimbursement claim. Mr. McClanahan could not have acquired this business on behalf of the community, even if he had wanted to, while he was holding the position as Secretary of the Department of Natural Resources. Basically, Ms. McClanahan argues that Mr. McClanahan should have made this deal for the community rather than hold the state job which precluded him from participating in such a business. We know of no legal principles that allow a wife entitlement, in a community property partition, to an award for funds her ex spouse should have earned or could have earned. In other words, a spouse has no claim for voluntary underemployment by a spouse during the marriage. Further, in calculating the value of the stock at the time of trial as the basis for her entitlement, Ms. McClanahan neglected to take into consideration the cost of acquisition and to deduct that amount from her claim. Accordingly, we find that this claim for reimbursement was properly rejected by the trial court.

Diversion of Funds to McClanahan Contractors
Ms. McClanahan argues that the trial court erroneously rejected her claim for reimbursement of community funds that were diverted to McClanahan Contractors. She bases this claim on the joint tax return of McClanahan Contractors for the period of August 1, 1997 to July 30, 1998, which shows an increase in the capital contribution in the amount of $1,213,290. She contends that this money had to have been contributed by Mr. McClanahan and, therefore, it would constitute community property to which she is entitled to reimbursement.
Mr. McClanahan argues, as he did on other issues, that an entry on a corporate tax return showing increase in capital does not automatically create a community reimbursement claim. Further, there is no proof in the record where the $1,213,290 came from. Mr. McClanahan contends it actually belonged to Aransas as a subsidiary of McClanahan Contractors and was not McClanahan Contractors' capital. This is an important distinction because *860 Mr. McClanahan in not an owner of Aransas. Aransas is owned by McClanahan Contractors. Further, Mr. McClanahan points out that the tax document used to prove this claim covers a four month period following the divorce during which the capital contributions could have been made and would not inure to the benefit of the community. Based on the foregoing, we cannot conclude that the trial court erred in rejecting this claim for reimbursement.

Reimbursement of Separate Funds to Mr. McClanahan for Purchase of Community Home at 735 Fairfield.
The trial court awarded Mr. McClanahan $150,000 as reimbursement of separate funds used to purchase community property, namely, the family home located at 735 Fairfield. Ms. McClanahan argues that the trial court erred in allowing Mr. McClanahan this reimbursement.
The home was purchased in 1992 for $400,000 from Ms. McClanahan, her sister and her mother. The purchase price was paid with $100,000 of community money and $300,000 borrowed from FNBC. The loan officer for FNBC testified that the $300,000 loan was secured with either a first mortgage on Mr. McClanahan's home, which was his separate property, located at 724 Fairfield, or by a negative pledge of that home. The loan application indicates that security for the loan was a "First mortgage on personal residence located at 724 Fairfield Avenue with appraised value of $361M as of 12/20/91 by Wayne Sandoz." No other mortgage or pledge documents were produced at trial.
Mr. McClanahan testified that when he sold 724 Fairfield, he paid off the $300,000 loan at FNBC on the community home with those proceeds. Therefore, he argues that he has traced separate funds used to purchase community property and is entitled to be reimbursed, as found by the trial court. The loan records support Mr. McClanahan's testimony indicating payment of the loan in full in March 1993. Based on the foregoing, we find no error in the trial court ruling that Mr. McClanahan used separate property, $300,000, to purchase community property and is entitled to be reimbursed $150,000.
Accordingly, for the reasons set out above, we affirm in part, reverse in part, amend in part and render the following judgment in accord with this opinion. Costs of appeal are to be borne by the parties.

JUDGMENT ON COMMUNITY PROPERTY PARTITION
After considering the argument of counsel, the briefs, the entire record in this matter and the applicable law;
IT IS ORDERED, ADJUDGED AND DECREED that the community property partition judgment is affirmed in part, reversed in part, amended in part and rendered as follows:

Assets to Susan F. McClanahan Value Assets to Jack McClanahan Value
735 Fairfield Ave. $525,000.00 FNBC Account # XXXXXXXXX $ 1,042.65
Furniture at 735 Fairfield Ave. $ 14,425.00 Prudential Securities IRA $ 34,154.00
Furniture at 320 Timberlane $ 21,815.00 Mass Mutual $ 81,430.00
Prudential Bache IRA in the name of $ 4,329.64 Barrios 401(k) $ 3,978.00
Susan F. McClanahan
Regions Bank IRA in the name of
Susan F.McClanahan $ 15,464.35 Bank One IRA Fruits $152,683.00
 ___________
FNBC Account in the name of Susan
F. McClanahan $ 2,650.51
 __________
TOTAL: $583,684.50 $273,287.65

*861
Total Assets: $856,972.15
One Half Share to Each: $ 428,486.07 $428,486.07
 ____________ ___________
Equalizing Payment: ($155,198.43) $155,198.42

IT IS ORDERED, ADJUDGED AND DECREED that the following reimbursements are due to the parties:

Reimbursements Due Susan F. McClanahan Value
Sterling Investments $ 18,912.50
Wood River Resorts $ 98,085.75
Management fees paid to Delta $ 58,125.00
FNBC Investment Account $ 1,262.68
 ___________
Total reimbursement Due Susan F. McClanahan: $176,385.68
Reimbursements Due Jack McClanahan: Value
Rolex watch $ 4,925.00
Purchase of 735 Fairfield Ave. $150,000.00
 ___________
Total Reimbursement Due Jack McClanahan: $154,295.00
Net Reimbursement Owed to Susan McClanahan: $ 22,090.68
Net Asset Equalization Owed to Jack McClanahan: $155,198.43
Net Due to Jack McClanahan From Susan F. McClanahan: $133,107.75

AFFIRMED IN PART, REVERSED IN PART, AMENDED IN PART AND RENDERED.

REHEARING GRANTED IN PART AND DENIED IN PART.
We grant the rehearing for the limited purpose of correcting an error in the computation of the reimbursement due Ms. McClanahan for the increase in value of Mr. McClanahan's separate property by the Wood River acquisition attributable to his community labor. In the original opinion we reduced the amount due by 22½% based on the factual error that Mr. McClanahan's three children owned 22½% of Aransas. In fact, the children own 22½% of Delta which would not warrant the reduction. Accordingly, we correct the reimbursement award due Ms. McClanahan for the Wood River Resorts claim by increasing it from $98,085.75 to $126,562.50, which thereby decreases the final amount due from Ms. McClanahan to Mr. McClanahan by $28,476.75. In all other respects the rehearing application is denied.
NOTES
[1] The parties were divorced by judgment dated January 21, 1999 which terminated the community retroactively to March 25, 1998, the date that the Petition for Divorce was filed.
[2] Mr. McClanahan facilitated the purchase of a 7½% interest in the company by his two year old daughter, Elizabeth, through funding from another corporation and income from her IRA.
[3] The only specific evidence concerning the origin of the capital contributions showed that $212,500 came from Wood River Resorts and $128,386 came from McClanahan, White, McClanahan. These amounts were deducted in arriving at the 1.6 million dollar figure. The precise figure as testified to by Ms. McClanahan's accountant was $1,539,324.